in his October 7, 2003, report that the petitioner's conditions of ill-being were causally connected to his work. The arbitrator repeated that same finding a few paragraphs down, saying both Dr. Stamoulos and Dr. Seigerman found that the petitioner's right shoulder condition of ill-being and the petitioner's bilateral carpal tunnel syndrome were causally connected to the work activities of the petitioner. I would submit to your court that this is absolutely false. It couldn't be more false. Dr. Seigerman never opined causal connection. He did just the opposite, and I'll explain that in just a moment. The commission as well completely misunderstood and misquoted Dr. Seigerman's opinions. They found that Dr. Seigerman found a causal relationship as to both the petitioner's claimed conditions of ill-being and in his initial and supplemental reports, which is a double error on their part. And they used Dr. Seigerman's opinion to justify the finding of causal connection and also to support the only finding in the record of the reasonableness and necessity of the medical treatment. You will recall that the arbitrator made no findings of fact regarding medical treatment.    He did not say that Dr. Seigerman's opinion was causal, other than saying the services were not provided by the ---- That was only Seigerman's second opinion, wasn't it? Pardon me? Seigerman's first opinion was there was a causal connection. No, Your Honor. You didn't say that? No. I'll read it to you. His initial opinion is this. What portion of the record are you referring to? Well, from his initial report dated October 7, 2003. What portion of the record? Are you reading from a document? Yes, I'm sorry. I'm sorry. I don't have the page number. What's the date again, then? October 7, 2003. This is what Dr. Seigerman wrote. I need specific job information concerning the manual requirements of the patient's work activities in order to provide an opinion concerning the issue of causal relationship. He did not offer an opinion in this letter. In fact, three paragraphs down, he repeats that. Causation for the diagnosis of carpal tunnel syndrome would also depend upon the manual requirements of the patient's job, which he did not So in your position, he gave no opinion at that time? Correct. And, in fact, in the last report, the supplemental report, he clearly stated that there was no causal connection. Counsel, who's Dr. Stamoulos? Treating physician, Your Honor. And Dr. Stamoulos gave the opinion of a causal connection, did it not? Yeah. In one of his treating medical records, which he called a letter of necessity, which really isn't what I would consider actually a part of Section 16, yeah, he did So a repetitive trauma case. The injuries are caused by repetitive uses of sheet metal work and overhead work. Right, which is actually questionable whether or not that is how the accident actually occurred. Well, I'm not asking you to give your opinion of the value of the testimony. That's what Stamoulos said, correct? Yes. He offered an opinion in his record, yes. And didn't Sagerman agree with that? Absolutely not. He didn't? No. Dr. Sagerman wrote that in his last report. I'm talking about his first report, not his last report. No, no, no. He said, I need information about his work activities in order to provide an opinion concerning the issue of causal relationship. What you're saying simply, there's only one opinion from Sagerman. Sagerman's asked to form an opinion first, and he says, I can't do it until I get a report as to what his job duties are. Correct. I have to defer my opinion until I get more information. And then later, what you call a supplemental report is when there is a job description, and at that point he renders an opinion. Correct. And in that opinion from January 7, 2004, he conclusively wrote that performance of this job would not cause or aggravate shoulder pathology or carpal tunnel syndrome, no causal connection could be made between the patient's work activities and the conditions affecting his upper extremities. The commission knew the problems with Dr. Sagerman's testimony. I honestly don't know what the commission knew because they misquoted him. What do they mean when they say in response to your interrogatory, the record fully supports the arrested assailant's defense of services provided to the petitioner to a reasonable necessary. Dr. Sagerman's response to the examiner agreed to the diagnosis of shoulder impingement and bilateral carpal forceful prison treatment rendered to date and made frequent recommendations of his own. Yes. They also knew that he had stated something that he had not been supplied some information with. I don't know why the commission took this a step further to find that Dr. Sagerman supported an opinion of the reasonableness of the charges. He never offered any opinion. When you go to the plaintiff's exhibit or petitioner's exhibit 29, is that what you have in front of you? That's what you're reading to us? October 7, 2003? Or 7, yes, Your Honor. From Sagerman? It's on the page 3 of his report. Dr. Sagerman never offered an opinion regarding the reasonableness of the charges for any medical services. If the commission thought that, they did not find it written in his reports. Yes, he did not have any challenges regarding the treatment rendered, but he never offered an opinion about the reasonableness of the charges. So I don't know how the commission found that. It's not anywhere in his reports. Did he state the treatment received thus far in the diagnostic testing for his right shoulder can be attributed to the work injury of July 8, 2003, based on the patient's description? The need for an EMG is not related? Yes. He said that? Right. Okay. But he said nothing about the reasonableness of the charges, which is what the commission found. I'm not talking about whether there's causation. He could say that he needed the treatment, but he's not also saying in the same sentence that there was causation. Can be attributed to the work injuries of July 8, 2003. Right. Based on the patient's description. Right, which he didn't rely upon because he said, I need more information before I can give you my opinion. He was told that petitioner told him I do 90% overhead work. He wanted confirmation of that before he would render his opinion, and he got contrary evidence to that. So I suggest that this is going all the way up from the arbitrator through the commission, even the dissenting commissioner misquoted what Dr. Sagerman found. Now, next, this is important because, again, the commission is trying to base its determinations of the reasonableness of the charges of the medical treatment on Dr. Sagerman plus the causal connection opinion. And even if there was some confusion as to Dr. Sagerman's causal connection opinion, it was certainly clarified in his final report. Now, granted, believing his report, finding it credible is one thing, but not reading what it says and saying something that it doesn't say is clearly another matter, and that's what the commission did. But does this change that much when you have Stamelos giving the connection opinion? I don't believe that the opinion of Dr. Stamelos, Stamelos, should be given much weight. There's no evidence that he was aware of any of the specific job duties that the petitioner had. He didn't know how much time, what effort was required in his manual labor versus supervisory duties. He simply said he works. I'm going to find causal connection. It's repetitive. I'm going to find causal connection. There's no evidence that he was made aware of any of the specific facts and circumstances regarding the repetitive nature of the injuries. Another issue which I wanted to clarify partly, again, talks about Dr. Sagerman and the issue of medicals. The issue of medicals was rather interesting. I found that now the arbitrator awarded the full amount of the medical, which was $33,956.95. He didn't give any credit at that time. He also found that Respondent had not paid anything towards those bills, and that's why he awarded the full amount, which leads to some confusion, I think, later on as to why the circuit court found that some of these bills had, in fact, been paid. Respondent never paid anything towards these bills, and that's why the arbitrator awarded the full amount of the bills. That's not to say that the charges were proven to be reasonable. The arbitrator gave no reason why they were reasonable. The commission wanted to say, based upon Dr. Sagerman and Dr. Stamoulos, I don't think Dr. Stamoulos specifically said that all the charges incurred were reasonable. But I think that needs to be clarified because that's going to tie in with the issue here of the H.J. credit. I think that the circuit court's conclusions were correct regarding the finding of the H.J. credit. I think that when you look at why Section H.J. is created, the circuit court judge was correct in her reasonings. I think it's a very simple issue here. In this case, and as in many others, there's a group disability or group health fund that's involved. Here, there's a union fund. The union group fund paid $19,000-some-odd towards payment of medical bills. This amount was awarded credit by the commission to the respondent, and this was absolutely correct. I don't think that's really an issue in dispute. The issue in dispute is what happens after that. I would suggest, and I think counsel would agree, can't find an appellate court decision which talks about the following issue that I would like to raise regarding H.J. credits. I think it has some import here. What happens in a situation where outside of the relationship between the petitioner and the respondent, the provider of benefits, here the union, requires that the petitioner sign a reimbursement agreement? The circuit court judge correctly found that this is not part of the workers' compensation proceeding. It's basically a private agreement outside of the workers' comp arena between the claimant and the provider. It could be the union. It could be any occupational group provider, Blue Cross Blue Shield, for instance. But how does that relate to what's happening in workers' comp? If you follow the logic of the arbitrator, where no credit at all was denied, where no credit was given, and if you follow the logic of the commission, which on the one hand grants H.J. credit, but on the other hand takes it away and says, well, you have to pay them back right now, there is no point to that statute. It's not only logically inconsistent, but I believe against the intention of the act to, on the one hand, award H.J. credit and then immediately find that the employer has to pay back the provider of those same benefits. There is no point to that statute. Why even have the statute then? It makes no point whatsoever. The respondent gains the op... Do you agree you have to hold the claimant harmless? Yes, yes, Your Honor. What triggers that? Okay, this is what I would propose and what happens in the real situation. At some point, usually when the provider of the benefits finds out that this claim has become compensable after a final award, usually, then that provider typically is going to send a letter to the claimant or the claimant's attorney and put them on notice saying, we understand now that this is a compensable claim. We improperly paid you non-occupational benefits. We want that money back. So that's where the hold safe and harmless clause is triggered. And I suggest that what should happen is we have to... But that's not the case here. You said after it's settled. They knew about the workman's comp claim before it was settled. Well, yes, that's... So what happens in this instance? Right. Well, it's interesting because there was no final determination of benefits when they demanded reimbursement. But the union's aware there's a comp claim. Yes, absolutely. And they want their money back. Right. And it was done prior to the resolution of the arbitration. Right. So what happens in those circumstances? Well, first... When is it triggered then? Well, first, there has to be a judicial determination that it becomes occupational, okay, because... Okay. It has to be an improper payment. So it has to become a compensable claim. And then the provider can say, oh, we improperly paid you. You owe us money now. Okay. When that happens, we would step in immediately, hold the petitioner safe and harmless, and basically cut a check to reimburse the party. The fears that petitioner has that he's going to be sued, taken to circuit court, and the whole thing, would not be realized and should not be realized if the employer... What is it about the circuit court's opinion relating to the H.A. credit? Do you object to an appeal? No, I don't. I said that this is correct. Can you finish your thought there? Don't you think you should finish arguing your case, let him argue his cross appeal, and then you respond to it? Could you? You were about to make a point to finish up. What was that point? We will hold the petitioner safe and harmless as the statute requires, because we have to do that in order to get the H.A. credit. It's a simple procedure. So the fears of the petitioner being harmed will not be realized if the Respondent acts in good faith, does what he's supposed to do, and steps in and holds the petitioner safe and harmless, and then reimburses the union or whoever that provider may be. And that's what the circuit court judge meant by we may be required to reimburse the union. What are you arguing to? His cross appeal? I'm arguing against his cross appeal. Yes, sir. Don't you think you should let him argue his cross appeal before you argue to it? I think that's kind of the way it works, isn't it? You argue your appeal, he responds to your appeal, and while he does that, he argues his cross appeal. On rebuttal, then it will make some sense to us when he gives us his reasons and then you respond. It kind of works that way. I was just trying to simplify. I'm sorry. And another point, again, the commission and the circuit court were correct in the determination of the average weekly wage. One or two wage statements is not sufficient to prove average weekly wage. Respondents submitted the whole wage statement for 52 weeks, and the commission properly applied the average weekly wage. Thank you very much. Thank you, counsel. Counsel, please. Thank you. Good afternoon, Your Honor. My name is Jim Kamite, and I represent Jerry Chesney in this case. May I proceed? Thank you. Firstly, I want to say that on the question of the medical issue that counsel brought up, the standard is against the manifest weight of the evidence. I think there's so much evidence in the record on causal connection that he can't possibly meet that burden of his argument. Why don't you straighten out for us exactly what his experts said in his first opinion? What did he say and what didn't he say? In his first opinion, the way I read that report was that he was finding causal connection in the connection with the accident causing the condition of ill-being in the claimant. Was the report introduced in evidence? Yes. The first report. Do you have it in front of you? I do not, Your Honor. I do not have any paperwork in front of me from the record. That's the 10703 medical record? The 10703. That was the first one. There's a statement by the examining physician indicating that there's a positive finding of a positive connection in the claimant. Then there was a second report where the first one he's saying that basically Sagerman said essentially I don't have enough information. I didn't read it that way. That wasn't the way I read it. I don't have it in front of me, but I did not read it as stated. Well, that's not the way the dissenting commissioner read it either. She read it as saying he found causal connection. They persisted, and he asked him to review stuff. He declined to change his opinion. That's the second report. The second report was a decline. Nevertheless, they persisted in providing him with this job description stating that he didn't do any manual labor. And at that particular point in time, he changed his opinion and said it wasn't. And then he turned around and testified that this job description that Ransco took from Kane and Zunkel, his coworkers, was absolutely incorrect. Different from the history provided by the plaintiff, the performance of the described job would not cause or aggravate shoulder pathology or causal trauma, which is. The way I read the third report is that there was a manufactured job description. You guys know what's in there. Now, it's not the way I read it. What did the man say? Is this some type of a game that's being played with a job description to get a doctor to change his opinion, or did he actually say in the first report that there was a causal connection? It's my position that the respondent manufactured that evidence in order to get their examining physician to change his opinion. That's my position in the brief. That's still my position here today. And the arbitrators obviously found that that was his position because he awarded attorneys' fees and penalties in the original award based on all those things that had occurred up to that point in the case. So I believe they manufactured evidence to get the physician to change his opinion, and he didn't. If you read that third report of Dr. Segerman carefully, you'll see that he's not even referring to the claimant. He's saying that this hypothetical worker who is being described in his job description is the person who would not have had a causal connection, a repetitive trauma. But he wasn't referring to the claimant. You can see, if you read it very carefully, he chooses his words carefully. He does not refer to the claimant as the person he's talking about in that third report. But if we go back and look at the evidence, you'll see how the evidence changed over the course of the case. First, Ramsco took a statement from their own people, from their employees. And in that written and recorded statement, the superintendent said that Jerry Chesney worked 30% with his tools. And the co-worker, Ben Zunkel, co-worker of Jerry Chesney, said that he worked 50% of the time with his tools. Mr. Chesney says he worked 85% to 95% with his tools. And then when they testified, when Tim Kaine testified and when Ben Zunkel testified, their numbers went way down, which was a subsequent statement. So they kept changing their testimony as they were going along, all that evidence is in the record. And then finally, the final thing was they produced a job description. The president, Frank Franco, produced a jobs description, and they gave that to Sagerman. Further, six months later after the accident, and that stating that they were trying to state that the petitioner or the claimant didn't work at all with his tools, which is a complete fabrication. His employees are saying he worked with his tools. Then the president comes and says, no, I don't, he doesn't work with his tools. It's this evolution of evidence that's occurred in this case. And to me, it's a fabrication all along the way. The evidence changes. The theories of the case change. They change their evidence, and they put in evidence. And it's clearly an abuse of this whole judicial process and disappointing to me. But I'm asking that this Court reinstate the penalties that were awarded in this case because they were properly awarded, and for the reasons that are stated in the brief, those penalties and attorney's fees should be reinstated in this case. It's a clear case. Let me just go, as long as I'm talking about that, there's two reasons. There's only two reasons in the record, and RAFSCO never explained why they denied workers' compensation to this claimant. There's only two reasons in the record. One is a hearsay statement that the secretary, Darlene Ringo, who was the mother-in-law of the president of the company, stated that the Friday before the 4th of July, Jerry Chesney talked to her on the telephone and said, I'm planning on working on my house over this weekend. That's it. Under cross-examination, Darlene Ringo said she didn't know if he worked on his house. She didn't know if he hired somebody. She didn't know anything about anything, just that he was planning on working. And then that third report of Dr. Sederman. Those are the only two reasons that they have in the record for not paying workers' compensation to this claimant. And that, I submit to this Court, is wholly insufficient to deny benefits to a claimant. Number one, the medical report was six months later after three other medical reports, including the treating doctor report, indicated that there was a causal connection. And this hearsay statement, what is that? Is that a defense now that any respondent can put forward and say, well, the claimant said they were planning on working at home, therefore I don't have to pay any benefits. What kind of a defense is that? Is that something now that's going to be in the commission decisions that other respondents are going to be able to rely on in order to beat out paying claimants without any repercussions of penalties or attorney's fees? If that's the case, then there's no need for the penalties and attorney's fees provisions in the Act because every respondent is going to come forth and say, oh, yeah, this claimant, he said he was working on his house. Is that a sufficient basis? And I don't think it is, and I submit that it's not. That's all I have to say about that on penalties. On the question of 8J, I think that the commission was correct in this decision. The circuit court was absolutely wrong, completely made an error of law insofar as the way that they viewed Section 8J. They completely wrote out the second portion of that section of the statute. It's gone. They sent the claimant to the circuit court. Now, Section 18 of the Act says that all issues in the Act must be decided by the commission. You can't send somebody to the circuit court and say, well, for this section in the Act you have to go to the circuit court. You can't come to the commission for a decision. That's wrong. That's not true. And, Mr. Steele, what is it about the circuit court's opinion that you disagree with? I disagree with where they vacated the award of ---- Plaintiff is entitled to a credit under Section 8J in the amount of $19,159.29 and shall hold defendant harmless many claims and demands by any providers for the benefits for which plaintiff is receiving credit under this order, not prospective payment. Okay. There's no such provision in the Act about prospective payment. There was a claim by the union against Mr. Chesney to be paid back, not only pursuant to the written agreement that was signed, but pursuant to the collective bargaining agreement there required. The union does not have to pay workers' compensation benefits. They do. They'll pay for someone's medical care if there's a dispute. But once, you know, there's an award that has to be paid back. So now we've got an award and we've got a claim by the union against the claimant. So now I'm objecting to the fact that the circuit court vacated the award in favor of the claimant of $19,000. Because the Act doesn't say that they can do that. Yes, it says this paragraph does not apply to payments made under any group plan, which would have been made payable irrespective of the accident and injury under that. Any employer receiving such credit shall keep such employees safe and harmless from any and all claims or liabilities that may be made against him by reason of having received such payments only to the extent of such credit. Okay. And my interpretation of that is. . . Now it turns around and modifies the decision of the arbitrator. Finally the respondent, H.A. Credit, $19,159. And the respondent is obligated to pay the petitioner this amount. That's correct. So the petitioner can then pay back the union. No, no, no. He holds the petitioner harmless and they pay the union. Well, I'm entitled to a fee for that because it was my order. Well, I'm not worried about your fees, counsel. I'm worried about whether your client is going to walk with a check for $19,159 and whether it's ever going to find its way to the union. Well, he's got the obligation to pay it. If he doesn't pay it to the union, that's between the two of them. No, no. All this employer is required to do is to hold your client harmless. Well, how does that get effectuated then? No, the claim is a liability. How does a hold harmless get effectuated? It's not just a term. Well, it is as soon as the union drags your client in and says, We want our $19,000 back. They did already. In this case, they did already. Excuse me. You third-party in Bransco, or you third-party in the employer, and they have to hold him harmless. That's already in this case. In this case, there is already a demand by the union, by the union lawyers, against my client. And not only that, but I had their representative testify that they're withholding future benefits from Jerry Chesney because he hasn't paid back that $19,000 yet. To the extent that they have withheld any money from your client in payment of that $19,000, to that extent, that employer is required to pay you back. Why should this be? He's bankrupt. This employer filed bankruptcy, and they haven't paid us a penny yet. Why should we let them do it now? Because that's what the Act says. If the Act turned around and said, you have to give the money to the claimant, and the claimant then will pay anyone who makes the claims, they would have said that. They didn't say it. Well, how is the hold harmless effectuated then? Through an award. It has to be effectuated through an award. Somebody has to make your client responsible for that money, and they then have to hold your client harmless from that payment. That's the way it works. But what if they're bankrupt, Judge? Don't we need an award to get the money to be able to do it? Why should we have to file a claim? If your client never is required to pay that money to the union, they are never required to pay their client. But that's not the facts of this case. The facts of this case are that he is already presently bankrupt. A demand has been made. A demand has been made. And a set off of future benefits. So that's a direct loss that my client is feeling. To the extent you've got a loss, establish the amount and get the judgment. Well, why should we have to go to circuit court for something that's under the Workers' Compensation Act? Excuse me. I didn't write the Workers' Compensation Act. And I can't rewrite it. Well, what does Section 18 say? Section 18 says that all issues in this Workers' Compensation Act must be decided by the commission. Not only that, but their defense is Section 5. So we sue them in the circuit court, then they flash up Section 5 so you can't sue us here. Because that's your exclusive remedy. Excuse me. Excuse me. You've already gotten a finding by the commission that they are required to hold your client honest. They can't relitigate that. That's the finding. They've got to hold him on a list to the extent of $19,159.29. Who's going to pay the legal fee for that? Who's going to pay the legal fee for Mr. Chesney and file another case in the circuit court to get this bankrupt employer to file a case? It's a wonderful argument to bring to the legislature. It's not going to happen, Judge. I think the interpretation that you're positioning to me is the wrong interpretation. That's the interpretation the circuit court put on it. It was the interpretation that the arbitrator put on it. The only one that changed it was the commission. It was the commission. And they had it right. My position is that they had it right because otherwise my client, because of the misdeeds of the respondent, my client now has a second piece of litigation to go forward with. And that's not what this Workers' Compensation Act means. You're supposed to get all of your issues adjudicated at the commission and not have to go somewhere else to get an adjudication on it. Let me ask you this, and I can't quote the section. Maybe Judge Hoffman could. If an employer doesn't pay any benefits, you can go to the circuit court to enforce that order, and attorneys' fees and penalties are assessed. That's because we have a final award issued in a dollar amount. We have a final award that has a dollar amount, and then we can petition the circuit court for a judgment on that dollar amount. I cannot go there and relitigate an issue that should have been litigated in the commission. So my position is I cannot go to the circuit court pursuant to section 5 and relitigate an issue that should have been litigated in the commission. And I may not be favoring it, but you're saying you can't go to the circuit court to enforce the Hold Harmless Agreement and then receive the – what are the penalties? You get attorney's fees and half the judgment. I'm saying that all issues, factual issues, have to be resolved at the commission level. Now, they may put forth a defense to the Hold Harmless in the circuit court, or they might just say now that we're suing them in the circuit court, section 5 says the exclusive remedy of the employee is in the commission. So if it's not stated in the commission decision, then we don't get it in the circuit court. So that's their defense. Isn't Hold Harmless set forth in the commission's decision? Hold Harmless – To the extent of $19,159.29? What's disturbing to you about that? What's disturbing to me is that it requires my client to file a second lawsuit when we shouldn't have to because the statute – He doesn't have to file any lawsuit. He gets to file a third-party action if he's sued by the union. He doesn't have to file a third-party action if he's sued by the union to collect the money. Well, he already is. He already has a claim pending and a reduction in his benefits already. That's already occurred. Your time is up. Okay. Thank you, Your Honor. Counsel Roboto. I appreciate counsel's concern regarding protecting his client, but I think the fears are greatly exaggerated. As soon as the employer is made aware of a final decision, and when the provider of the benefits, here the union, makes a demand upon the petitioner for a claim, reimburse us what we've paid, we're going to step in and hold him safe and harmless. What if you don't? Well, I would say that that would be a very stupid thing to do, and I'm not going to counsel my client to do that. I know, but I'm asking you for purposes of setting a precedent. What happens next? What does he do? Well, assuming – I don't know what's going to be in your order. Your order may very well address what we have to do regarding that. But the union may file a lawsuit against Mr. Chesney. You're going to make the union file a lawsuit before you give them a lawsuit? No, that's the whole point. No, no, no, no. That's the whole point. Like I said, I would never want him to go that far. As soon as we know there's a final decision, and as soon as we know that union has a final decision by whom? Your Honors, the court. Okay. Showing that this is an occupational claim and that, therefore, the union provided benefits that they need not have because they're only supposed to pay non-occupational benefits. And as soon as we know that the union is demanding reimbursement, we will immediately step in and we have it reserved. And I'm going to tell my client, when you pay this award, assuming it's, you know, whatever may happen, we have to hold him safe and harmless, cut the check to include a payment to the union for the amount that they paid. That sounds all good, but he's arguing the real world where you're going bankrupt. So what do we do then? If the company goes bankrupt because he's a lesbian, then what happens? That didn't matter in this case because it's part of a pool. There is money set aside in the group self-insurance pool. I wouldn't be here today if they didn't have money. Who's his remedy under the Act if you don't hold him harmless? What section of the Act gives him a remedy? What does he do? That's a very good question. I'm not sure. I suppose he could petition perhaps the commission to somehow withdraw the order of credit because we're not holding him safe and harmless. Perhaps it's a 19G where he can go into circuit court and enforce the final order, which says that we have to reimburse. We get our credit, but we have to hold the petitioner safe and harmless. Beyond that, I'm not sure what he could do. He may be able to file a separate cause of action in the circuit court, which is what the circuit court judge, I believe, was implying when she said it doesn't belong at the commission. He's saying why should he have to do that? And I agree. He shouldn't. We won't let it happen because then we're not really holding him safe and harmless, are we? Now, the word bankruptcy has been thrown around, so if your client is in bankruptcy, is there a stay of any type and a force? It was lifted a long time ago. So there is no stay on the bankruptcy? Correct. I couldn't be here. I know you couldn't, but we had somebody else come anyway. Oh, no, it was lifted a long time ago. It's really irrelevant whether your client is bankrupt, isn't it? Is your third party indemnified? The bankruptcy is irrelevant. There is money. It's not coming from the employer, obviously, but it's coming from the pool, and also there is an excess carrier involved. If your employer went bankrupt and you didn't meet your whole harmless, would he have a claim against the guarantee fund? No, because this was an employer that was part of a pool, and there's an excess carrier involved, so there is a source of income. Thank you. Thank you, Your Honor.